RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
Jeffrey S. Ratliff
5441 S. Macadam Ave., Suite 301
Portland, OR 97239
T: 503-226-3664

*Liaison Counsel for Plaintiff*

[Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

| | |
|---|---|
| LLOYD STEINBERG and SCOTT MUSTRIC, Individually and on behalf of all others similarly situated, | **Case No: 3:22-cv-01533-YY** |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SCHMITT INDUSTRIES, INC., DAVID W. CASE, ANN M. FERGUSON, MICHAEL R. ZAPATA, PHILIP BOSCO, and JAMIE SCHMIDT, | |
| Defendants. | |

Lead Plaintiff Scott Mustric ("Lead Plaintiff") and named plaintiff Lloyd Steinberg ("Named Plaintiff" and, collectively with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for their Amended Complaint (hereafter the "Complaint" or the "Amended Complaint") against Defendants Schmitt Industries, Inc. ("Schmitt", "Schmitt Industries" or the "Company"), David W. Case ("Case"), Ann M. Ferguson ("Ferguson"), Michael R. Zapata ("Zapata"), Philip Bosco ("Bosco"), and Jamie Schmidt ("Schmidt"), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other

1

matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of: (i) Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with former employees of the Company with relevant information; and (v) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of purchasers of the publicly traded Schmitt common stock between August 21, 2018 and September 20, 2022, inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").  Excluded from the Class are Defendants, the present and former officers and directors of Schmitt, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

2.     Defendant Schmitt purports to design, manufacture and sell high precision test and measurement products, solutions, and services through its Acuity® and Xact® product lines. The Company also owns and operates Ample Hills Creamery ("Ample Hills" or "AHC"), an ice cream manufacturer and retailer based in Brooklyn, New York. Defendant Schmitt purchased Ample Hills out of bankruptcy on July 10, 2020.

3.      Unbeknownst to investors and contrary to Schmitt's public disclosures, Schmitt's internal audit function and internal controls were recklessly deficient for years. Schmitt failed to pay sales taxes, failed to follow fundamental and basic Generally Accepted Accounting Principles ("GAAP"), and purchased an asset whose books were deemed 'not auditable.'

4.      It was not until August 31, 2020, when Schmitt filed its Form 10-K for the fiscal year ended May 31, 2020, that Schmitt first started to admit – albeit incompletely – that it was suffering from deficiencies in internal controls. Schmitt explained its internal controls had deficiencies in the design and operation of internal controls over segregation of duties and ineffective management review over the accounting reconciliations including accounting for inventory, accrued liabilities and taxes. However, Schmitt downplayed the severity of its internal control weaknesses and did not disclose the full extent of its internal control weaknesses. Indeed, according to FE1[1], Schmitt had never paid sales taxes in its history, going as far back as the 1980s.

5.      Schmitt purportedly prepared its financial statements in conformity with GAAP. This was untrue. Schmitt would ultimately disclose on September 20, 2022 that its financial statements as of and for the quarterly periods ended from August 31, 2021 through February 28, 2022, including the comparative periods, (1) should no longer be relied upon due to errors in the treatment of certain general and administrative expenses that were excluded from the statement of operations and (2) will require restatement. On this news, Schmitt's stock price fell 17% to close at $3.12 per share on September 21, 2022, on unusually heavy trading volume, damaging investors.

---

[1] Facts detailing each CW's position, tenure, responsibilities and access to information provided are set forth herein in ¶¶ 24-30.

6.     The sorry state of Schmitt's internal audit and control process was further exacerbated by its acquisition of Ample Hills on July 10, 2020.  Schmitt, which had long been a high precision test and measurement products company, had no experience in the retail ice cream business.  Nonetheless, the United States Bankruptcy Court for the Eastern District of New York announced on June 9, 2020 that Schmitt was the successful bidder for the acquisition of certain Ample Hills assets. The Company announced the acquisition of Ample Hills on July 10, 2020.  More than a year later, on October 20, 2021, Schmitt announced that Ample Hills' books were not auditable.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

10.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.      Plaintiffs, as set forth in their previously filed certification (Named Plaintiff at ECF No. 1, Lead Plaintiff at ECF No. 14-2), incorporated by reference herein, purchased Schmitt securities during the Class Period and was economically damaged thereby.

12.      Defendant Schmitt is incorporated in Oregon.  Schmitt's headquarters are located 2765 N.W. Nicolai Street, Portland, Oregon 97210. At the commencement of this case, Schmitt securities traded on NASDAQ under the ticker symbol "SMIT." On January 23, 2023, after the class period, NASDAQ announced that Schmitt common stock would no longer trade on NASDAQ, and that it had been suspended since January 17, 2023. As of the filing of this Amended Complaint, Schmitt common stock trades over-the-counter.

13.      Defendant Case has served as the Company's Chief Executive Officer ("CEO") from at least the start of the Class Period to October 2018.

14.      Defendant Zapata has served as the Company's CEO, President, and Executive Chairman since August 2019.

15.      Defendant Ferguson has served as the Company's Chief Financial Officer ("CFO") from at least the start of the Class Period to November 2019.

16.      Defendant Jamie Schmidt ("Schmidt") served as the Company's CFO from January 2020 through December 2020.

17.      Defendant Philip Bosco ("Bosco") has served as the Company's CFO and Treasurer since December 2020.

18.      Defendants Case, Zapata, Ferguson, Schmidt, and Bosco are collectively referred to herein as the "Individual Defendants."

19.      Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

20.     Schmitt is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Schmitt under *respondeat superior* and agency principles.

22.     Defendant Schmitt and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

23.     Schmitt was originally incorporated under the laws of British Columbia, Canada, in 1984 and reincorporated under the laws of Oregon in 1995. At the start of the Class Period, Schmitt had two main business segments: the Balancer segment and the Measurement segment. Schmitt designed, manufactured, and sold high precision test and measurement products for the two main business segments.

### Witnesses

24.     Former Employee ("FE") 1 was Schmitt's Corporate Controller from September 2020 to May 2022. FE1 reported to Defendant Bosco. FE1 has 30 years of experience working with startups and turnarounds.

25.     FE2 was Schmitt's Accounting Manager from October 2021 to December 2022. FE2 is a Certified Public Accountant and a Certified Fraud Examiner.

26.     FE3 worked at Ample Hills for the original owners as an Events Operation Coordinator.  When Schmitt purchased Ample Hills, FE3 became the Order Management and Purchasing Manager.  FE3 worked at Ample Hills from October 2019 to January 2023. FE3 shared an office space with Defendant Bosco.

27.     FE4 was an Accounting Manager at Schmitt from April 2021 to April 2022.  One of FE4's responsibilities was to review all the cash that had cleared the bank, post it against the outstanding checks, and provide the CFO and controller with a weekly or periodic cash balance. FE4 was the one who warned Defendant Bosco as Schmitt got closer to a zero cash position.

28.     FE5 was an Accounting Manager at Ample Hills from October 2021 to January 2023. FE5 is a Certified Public Accountant.  According to FE5, FE2 and FE5 were hired to help clean up Schmitt's accounting practices.

7

29.     FE6 worked at Schmitt from June 2020 to January 2022.  FE6's last position at Schmitt was Director of Finance and reported directly to Defendant Bosco.

30.     FE7 worked at Schmitt from December 2020 to August 2022.  FE7 started as an Accounts Payable Clerk and was Accounts Payable Manager prior to being laid off.  FE7 reported directly to Defendant Bosco in their role as Accounts Payable Manager.

## Materially False and Misleading
## Statements Issued During the Class Period

31.     On August 21, 2018, Schmitt filed its Form 10-K for the fiscal year ended May 31, 2018 ("2018 10-K").  The 2018 10-K was signed by Defendants Case and Ferguson. Attached to the 2018 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Case and Ferguson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

32.     The 2018 10-K stated, in pertinent part:

*"The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States of America* requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

*    *    *

Our management is responsible for establishing and maintaining adequate internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an evaluation of the effectiveness of our internal controls over financial reporting based on the framework in *Internal Controls – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework in *Internal Control – Integrated Framework,* *our management concluded that our internal controls over financial reporting were effective as of May 31, 2018."*

(Emphasis added.)

33.     The statements in ¶32 were false and/or misleading because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with GAAP because Schmitt was not paying sales taxes.  According to FE1, Schmitt had never paid any sales tax in its history going back to the 1980s.  Likewise, FE2 explained that the issues concerning sales tax was well known even before FE2 started with the Company, and that the issue was still ongoing when FE2 left in December 2022.  The failure to pay sales tax rendered Schmitt's statements about its purported effective internal controls over financial reporting materially false and misleading.

34.     On August 21, 2019, Schmitt filed a Form 10-K for the fiscal year ended May 31, 2019 ("2019 10-K"). Attached to the 2019 10-K were SOX certifications signed by Defendants Zapata and Ferguson attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.     The 2019 10-K stated, in relevant part:

*"The preparation of the consolidated financial statements in conformity with accounting principles generally accepted in the United States of America* requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes.

*        *        *

Our management is responsible for establishing and maintaining adequate internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Under the supervision and with the participation of our management, including our CEO and CFO, we conducted an evaluation of the effectiveness of our internal controls over financial reporting based on the framework in *Internal Controls – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our evaluation under the framework in *Internal Control – Integrated Framework,* *our management concluded that our internal controls over financial reporting were effective as of May 31, 2019."*

(Emphasis added.)

36.     The statements in ¶35 were false and/or misleading because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with GAAP because Schmitt was not paying sales taxes.  According to FE1, Schmitt had never paid any sales tax in its history going back to the 1980s.  Likewise, FE2 explained that the issues concerning sales tax were well known even before FE2 started with the Company, and that the issue was still ongoing when FE2 left in December 2022.  The failure to pay sales tax also rendered Schmitt's statements about its purported effective internal controls over financial reporting materially false and misleading.

37.     On August 31, 2020, Schmitt filed a Form 10-K for the fiscal year ended May 31, 2020 ("2020 10-K")[2]. Attached to the 2020 10-K were SOX certifications signed by Defendants Zapata and Schmidt attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

38.     In relevant part, the 2020 10-K stated:

"The analysis of our financial condition and results of operations, above, are based upon our Consolidated Financial Statements, which have been *prepared in accordance with accounting principles generally accepted in the United States of America.*"

(Emphasis added.)

39.     The statements in ¶38 were false and/or misleading because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with

---

[2] The September 28, 2020 amendment to the 2020 10-K filed with the SEC on Form 10-K/A did not include financial statements or statements related to the Company's internal controls.

GAAP because Schmitt was not paying sales taxes. According to FE1, Schmitt had never paid any sales tax in its history going back to the 1980s. Likewise, FE2 explained that the issues concerning sales tax was well known even before FE2 started with the Company, and that the issue was still ongoing when FE2 left in December 2022. The failure to pay sales tax rendered Schmitt's statements about its purported effective internal controls over financial reporting materially false and misleading.

40.     The 2020 10-K also revealed that Schmitt had a material weakness in its internal controls, stating in pertinent part:

> "Based on our evaluation under the framework in *Internal Control – Integrated Framework*, _our management concluded that our internal controls over financial reporting were not effective as of May 31, 2020._
>
> Our CEO and CFO concluded that _we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties; and ineffective management review over the accounting reconciliations including accounting for inventory, accrued liabilities and taxes._
>
> *          *          *
>
> ***Management's Remediation Initiatives***
>
> Management has developed a remediation plan in response to the material weakness identified, which includes:
>
> •     revising the design of existing controls, and designing and implementing additional key controls related to identifying and accounting for both routine and nonroutine transactions, which include protocols for engaging third-party accounting experts, where necessary;
> •     establishing protocols to ensure key controls operate on a timely basis to prevent and detect misstatement;
> •     providing additional GAAP technical accounting and internal control related training to both accounting and non-accounting departments.
>
> We anticipate that these plans will be fully implemented and tested during 2021 such that our internal control deficiency will be remediated in that timeframe.
>
> (Underlined emphasis added.)

41.     The statements in ¶40 were false and/or misleading when made because they continued to downplay the serious issues with the Company's internal controls, hiding the true extent of the recklessness at Schmitt. The 2020 10-K stated that Schmitt's internal controls were deficient "in the design and operation of internal controls over segregation of duties; and ineffective management review over the accounting reconciliations including accounting for inventory, accrued liabilities and taxes." This did not provide the full scope of the internal control deficiencies, as a later 10-K would disclose additional issues concerning "accounting for stock-based compensation, accounts receivable, accounts payable, inventory, accrued liabilities, sales taxes, expense classification, depreciation of property and equipment, and earnings per share." This announcement continued to hide from investors the fact that Schmitt had not paid any sales tax since the 1980s.

42.     Furthermore, Defendants stated that management had already come up with a remediation plan to address the deficient internal controls. According to the 2020 10-K, the remediation plan was expected to be tested and implemented during 2021 "such that [Schmitt's] internal control deficiency will be remediated in that timeframe[,]" further downplaying the extent of Schmitt's deficient internal controls.

43.     The 2020 10-K also included a section outlining risks related to Ample Hills. , Notably missing from this section was any discussion concerning Ample Hills' books and records. Even though Schmitt had the opportunity to review Ample Hills' books and records prior to purchase, Schmitt failed to disclose risks associated with Ample Hills' accounting practices – notably, that Ample Hills' records were in such shambles that it would eventually be deemed "not auditable."

**The Truth Begins to Emerge, But Defendants Continue Mistruths**

44.     On August 31, 2021, Schmitt filed a Form 10-K for the fiscal year ended May 31, 2021 ("2021 10-K").[3] Attached to the 2021 10-K were SOX certifications signed by Defendants Zapata and Bosco attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

45.     The 2021 10-K stated, in relevant part:

"The analysis of the Company's financial condition and results of operations are based upon our Consolidated Financial Statements, which have been ***prepared in accordance with Generally Accepted Accounting Principles*** in the U.S. ("GAAP")."

(Emphasis added.)

46.     The statement in ¶45 was false and/or misleading because, at the time the statement was made, Schmitt was not preparing its financial statements in conformity with GAAP because Schmitt was not paying sales taxes, as corroborated by FE1 and FE2.

47.     The 2021 10-K also revealed that Schmitt had additional material weaknesses in its internal controls not previously disclosed, stating in relevant part:

"Based on our evaluation under the framework in *Internal Control - Integrated Framework*, ***our management concluded that our internal controls over financial reporting were not effective as of May 31, 2021.***

Our CEO and CFO concluded that ***we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties, as well as insufficient and imprecise management review controls in the financial close process relating to the accounting for stock-based compensation, accounts receivable, accounts payable, inventory, accrued liabilities, sales taxes, expense classification,***

---

[3] The September 28, 2021 amendment to the 2021 10-K filed with the SEC on Form 10-K/A did not include financial statements or statements related to the Company's internal controls.

*depreciation of property and equipment, and earnings per share.* In addition, the Company has insufficient number of qualified accounting personnel governing the financial close and reporting process.

*   *   *

***Notwithstanding the identified material weaknesses, management believes that the Consolidated Financial Statements included in this Annal* [sic] *Report on Form 10-K present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.***

(Underlined emphasis added.)

48.     The statements in ¶47 were false and/or misleading when made because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with GAAP because Schmitt was not paying sales taxes, as corroborated by FE1 and FE2 and as identified as a material weakness. Furthermore, Defendants downplayed the serious issues with the Company's internal controls, hiding the true extent of the recklessness at Schmitt. Despite Ample Hills' books and records being in such shambles that it would eventually be deemed "not auditable," Defendants failed to disclose this fact in the 2021 10-K, over a year after purchasing Ample Hills.

49.     Furthermore, FE7 explained that Schmitt was unable to pay its vendors on time due to a lack of cash. According to FE7, vendors were paid according to how much money Schmitt had on hand. FE7 explained Ample Hills employees were paid bi-weekly, and on such weeks, vendors would not get paid. FE7 also explained that Schmitt held monthly finance meetings attended by the CFO, controllers, and members of the Accounts Payable and Accounts Receivable teams. Those in attendance were barred from discussing financial issues with other employees.

50.     On this news, the share prices of Schmitt fell by $0.16, or approximately 3%, to close on September 1, 2021 at $4.86.

51.     On October 20, 2021, Schmitt filed a Form 10-Q for the fiscal quarter ended August 31, 2021 (Q1 2022 10-Q). Attached to the Q1 2022 10-Q were SOX certifications signed by Defendants Zapata and Bosco attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

52.     The Q1 2022 10-Q contained the following financial statement:

| | Three Months Ended August 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| Net sales | $ 3,759,175 | $ 1,507,485 |
| Cost of revenue | 1,349,975 | 899,841 |
| Gross profit | 2,409,200 | 607,644 |
| Operating expenses | | |
| Selling, general and administrative | 4,130,686 | 2,086,716 |
| Transaction costs | | 125,167 |
| Research and development | 9,265 | 17,453 |
| Total operating expenses | 4,139,951 | 2,229,336 |
| Operating loss | (1,730,751) | (1,621,692) |
| Bargain purchase gain | — | 1,271,615 |
| Forgiveness of Paycheck Protection Program loan | 588,534 | — |
| Interest expense | (11,276) | (2,511) |
| Other income, net | 112,039 | 98,580 |
| Loss before income taxes | (1,041,464) | (254,008) |
| Income tax provision (benefit) | 3,575 | (404,667) |
| Net (loss) income | $ (1,045,039) | $ 150,659 |
| Net (loss) income per common share | | |
| Basic | $ (0.28) | $ 0.04 |
| Weighted-average number of common shares, basic | 3,780,439 | 3,763,752 |
| Diluted | $ (0.28) | $ 0.04 |
| Weighted-average number of common shares, diluted | 3,780,439 | 3,776,494 |

53.     The Q1 2022 10-Q was false and/or misleading because it under-recognized expenses by $559,818.

54.     The Q1 2022 10-Q stated the following, in pertinent part, concerning Schmitt's internal controls:

> "Notwithstanding the identified material weaknesses, *management believes that the consolidated financial statements included in this Quarterly Report on Form 10-Q present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.*"
>
> (Emphasis added.)

55.     The statements in ¶54 were false and/or misleading when made because the financial statements in the 1Q 2022 10-Q was not accurate and would later be restated. Additionally, according to FE2, Schmitt had still not resolved its outstanding issues concerning unpaid sales tax when these statements were made.  As such, the financial statements in the 1Q 2022 10-Q were not compliant with GAAP.

56.     The 1Q 2022 10-Q also disclosed the truth about Ample Hills' records. In pertinent part, the 1Q 2022 10-Q stated, "Management has performed a thorough evaluation of the pre-bankruptcy books and found the records to not be auditable."

57.     On this news, Schmitt's share prices fell by $0.08, or approximately 1.9%, to close at $3.82 on October 21, 2021.

58.     On January 14, 2022, Schmitt filed a Form 10-Q for the fiscal quarter ended November 30, 2021 (Q2 2022 10-Q). Attached to the Q2 2022 10-Q were SOX certifications signed by Defendants Zapata and Bosco attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

59.     The Q2 2022 10-Q contained the following financial statement:

| | Three Months Ended November 30, | |
| | 2021 | 2020 |
| --- | --- | --- |
| Net sales | $ 2,961,965 | $ 2,029,712 |
| Cost of revenue | 1,356,874 | 1,067,599 |
| Gross profit | 1,605,091 | 962,113 |
| Operating expenses | | |
| Selling, general and administrative | 4,161,890 | 3,091,516 |
| Transaction costs | | |
| Research and development | 5,580 | 17,877 |
| Total operating expenses | 4,167,470 | 3,109,393 |
| Operating loss | (2,562,379) | (2,147,280) |
| Bargain purchase gain | — | — |
| Adjustments to bargain purchase gain | — | (82,103) |
| Gain on sale of property and equipment | 4,598,095 | — |
| Forgiveness of PPP loan | — | — |
| Interest expense | (18,303) | (1,285) |
| Other income (expense), net | 173,274 | (134,164) |
| Income (loss) before income taxes | 2,190,687 | (2,364,832) |
| Income tax provision (benefit) | 2,775 | 1,637 |
| Net income (loss) | $ 2,187,912 | $ (2,366,469) |
| Net income (loss) per common share | | |
| Basic | $ 0.58 | $ (0.63) |
| Weighted-average number of common shares, basic | 3,784,000 | 3,763,156 |
| Diluted | $ 0.57 | $ (0.63) |
| Weighted-average number of common shares, diluted | 3,819,616 | 3,763,156 |

60.     The Q2 2022 10-Q was false and/or misleading because it overstated expenses by $353,048.

61.     The Q2 2022 10-Q stated the following regarding Schmitt's internal controls in relevant part:

> "Notwithstanding the identified material weaknesses, *management believes that the consolidated financial statements included in this Quarterly Report on Form 10-Q present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.*"

(Emphasis added.)

62.     The statements in ¶61 were false and/or misleading when made because the financial statements in the 2Q 2022 10-Q were not accurate and would later be restated. Additionally, according to FE2, Schmitt had still not resolved its outstanding issues concerning unpaid sales tax when these statements were made. As such, the financial statements in the 2Q 2022 10-Q were not compliant with GAAP.

63.     On April 14, 2022, Schmitt filed a Form 10-Q for the fiscal quarter ended February 28, 2022 (Q3 2022 10-Q). Attached to the Q3 2022 10-Q were SOX certifications signed by Defendants Zapata and Bosco attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

64.     The Q3 2022 10-Q contained the following financial statement:

| | Three Months Ended February 28, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Net sales | $ 1,848,913 | $ 1,668,444 |
| Cost of revenue | 912,076 | 837,254 |
| Gross profit | 936,837 | 831,190 |
| Operating expenses | | |
| Selling, general and administrative | 3,312,388 | 3,313,918 |
| Transaction costs | — | — |
| Research and development | 10,771 | 21,732 |
| Total operating expenses | 3,323,159 | 3,335,650 |
| Operating loss | (2,386,322) | (2,504,460) |
| Bargain purchase gain | — | (2,277) |
| Gain on sale of property and equipment | — | — |
| Forgiveness of PPP loan | 1,471,292 | — |
| Interest expense | (8,232) | (5,400) |
| Other income, net | 38,286 | 90,703 |
| Income (loss) before income taxes | (884,976) | (2,421,434) |
| Income tax provision (benefit) | 8,268 | (1,637) |
| Net income (loss) | $ (893,244) | $ (2,419,797) |
| | | |
| Net income (loss) per common share: | | |
| Basic | $ (0.24) | $ (0.64) |
| Weighted-average number of common shares, basic | 3,788,315 | 3,764,536 |
| Diluted | $ (0.24) | $ (0.64) |
| Weighted-average number of common shares, diluted | 3,788,315 | 3,764,536 |

65.     The Q3 2022 10-Q was false and/or misleading because it under-recognized expenses by $123,433.

66.     The Q3 2022 10-Q contained, in relevant part, the following language concerning Schmitt's internal controls:

> "Notwithstanding the identified material weaknesses, *management believes that the condensed consolidated financial statements included in this Quarterly Report on Form 10-Q present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.*"
>
> (Emphasis added.)

67.     The statements in ¶66 were false and/or misleading when made because the financial statements in the 3Q 2022 10-Q was not accurate and would later be restated. Additionally, according to FE2, Schmitt had still not resolved its outstanding issues concerning unpaid sales tax when these statements were made.  As such, the financial statements in the 3Q 2022 10-Q were not compliant with GAAP.

### Additional Allegations Demonstrating Falsity and Scienter

68.     Schmitt purchased Ample Hills, a Brooklyn-based ice cream manufacturer and retailer, out of bankruptcy.  The United States Bankruptcy Court for the Eastern District of New York announced on June 9, 2020 that Schmitt was the successful bidder for the acquisition of certain Ample Hills assets.  The Company announced the acquisition of Ample Hills on July 10, 2020.  More than a year later, on October 20, 2021, Schmitt announced that Ample Hills' books and records were not auditable.  Defendants provide no explanation as to why Schmitt purchased Ample Hills or why it took them over a year to realize that Ample Hills' books were not auditable.

69.     FE6 explained that Defendant Schmidt, who was the CFO at the time of the Ample Hills acquisition, did not have an accounting background. According to FE6, "He was not familiar with running an accounting and finance department."  Despite having access to Ample Hills' books and records per the asset purchase agreement, the Company recklessly failed to recognize that Ample Hills' books were not auditable.

70.     According to FE3, as Ample Hills was being audited, more and more discrepancies would be uncovered along the way. As an example, FE3 explained that a lot of items were not being coded properly, such as beverages sold in stores being coded in the general ledger as "Water Utilities."  According to FE3, Defendant Zapata's management of Ample Hills

was "on a whim rather than a plan." FE3 explained that, even as Ample Hills appeared to be headed for a downfall, management did not take steps, such as a hiring freeze or a cap on spending, to address Ample Hills' financial issues. None of these issues were disclosed in the Company's SEC filings during the Class Period.

71.    FE1 corroborated FE3's account, explaining that, during FE1's tenure, Ample Hills "never made money. It was always at a loss and burning more money than they were making, at a phenomenal rate."

72.    FE4, who reconciled Ample Hills' cash on a daily basis, explained that that Ample Hills was not profitable. According to FE4, between Schmitt's core business and Ample Hills, the Company was losing $1 million to $2 million every month.

73.    Additionally, FE4 explained that both Accounts Payable and Accounts Receivable were ineffective, and that there were a lot of broken processes at Schmitt. As an example, FE4 explained that when they first joined Schmitt in April 2021, the Company was three months behind on month-end close. FE4 explained that an Accounts Payable manager would reprocess any bounced payments instead of voiding the payment in the system, resulting in double or triple payments. FE4 described Accounts Receivable as a mess, with extensive and outstanding accounts receivable. FE4 also corroborated that Schmitt's non-payment of sales tax was an issue.

74.    FE2 explained that, when they joined Schmitt in October 2021, the Accounts Payable team was "following procedures established by people that didn't know accounting." FE2 explained that, per GAAP, invoices should be booked at the time the service is rendered. Instead, Schmitt waited until they received the bill to record the payment. According to FE2,

this was wrong, and that the proper procedure would have been to "record[] an estimate, reverse it, and then record[] the new amount" upon receiving the bill.

75.    FE5 corroborated FE2's account regarding the proper procedure for the timing of recording an expense.  FE5 explained, "Nobody in [the Portland] office understood that – if somebody provided a service to us in January and billed us in March, they were reflecting that expense in March, but as a public company, it should have been reflected in January when the expense actually occurred."  According to FE5, the issues in Schmitt were so prevalent "[i]t was enough to make the auditors test everything."

76.    FE5 also described Defendant Zapata as a disinterested CEO.  FE5 explained that Zapata provided no leadership, describing a particular instance where FE5 was pitching a detailed package of new initiatives that the Company needed to do in order to make the Company more profitable and efficient.  "Five minutes into the meeting, which was about things that should be changed, and what management should have been vitally interested in, Zapata took a phone call and walked out of the room."

77.    On September 20, 2022, the Company announced that it would restate its financial statements from August 31, 2021 to the present and expected to report at least one material weakness, stating the following, in pertinent part, in a Form 8-K:

> **Item 4.02.    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> *The Company has determined that it made certain errors* due to the ineffective application of cut-off procedures resulting primarily in the exclusion of certain general and administrative expenses from the statement of operations in the Company's financial statements during the fiscal year ended May 31, 2022. *The Company will therefore restate its previously filed quarterly financial statements for periods from August 31, 2021 forward*, as described further below. *The Company currently estimates that the errors were material on a cumulative basis* resulting in a net $330,203 under-recognition of expenses over the first three quarters of the fiscal year. Specifically, the Company estimates a

Q1 under-recognition of expenses by $559,818, a Q2 over-recognition of expenses by $353,048, and a Q3 under-recognition of expenses by $123,433.

Specifically, on September 19, 2022, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company concluded, after discussion with the Company's management, that the Company's financial statements as of and for the quarterly periods ended from August 31, 2021 through February 28, 2022 (collectively, the "Non-Reliance Periods") included in the associated Form 10-Qs for the periods ended August 31, 2021, November 30, 2021 and February 28, 2022, including the comparative periods, filed with the Securities Exchange Commission (the "SEC"), *(1) should no longer be relied upon due to errors in the treatment of certain general and administrative expenses that were excluded from the statement of operations and (2) will require restatement.* As a result, the Company will file amendments to its Form 10-Qs for the periods ended August 31, 2021, November 30, 2021 and February 28, 2022 to restate the previously issued financial statements including the comparative periods. Similarly, *any previously issued or filed reports, press releases, earnings releases, and investor presentations or other communications describing the Company's financial statements and other related financial information covering the Non-Reliance Periods should no longer be relied upon.*

The Company is currently determining the exact amounts and full effect of the errors in the financial statements covering the Non-Reliance Periods. The Company's preliminary estimate is that, as of May 31, 2022, the cumulative effect of these errors is a misstatement of $330,203 in under-recognized expenses during the first three quarters of its fiscal year; however such amount is subject to revision as the Company finalizes its analysis. ...

*Management is assessing the effect of these restatements on the Company's internal control over financial reporting and its disclosure controls and procedures. The Company expects to report at least one material weakness following completion of its analysis of the cause of these restatements.* A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. ... As a result of the material weakness or material weaknesses, the Company believes that its internal control over financial reporting was not effective and its disclosure controls and procedures were not effective for the Non-Reliance Periods.

(Italicized emphasis added.)

78.    On this news, Schmitt's stock price fell 17% to close at $3.12 per share on

September 21, 2022, on unusually heavy trading volume, damaging investors.

79.    Restatements are required for "material" accounting errors that existed at the time financial statements were prepared. *See* Statement of Financial Accounting Standards 154 (Accounting Standards Codification 250-10). By issuing the Restatement, Schmitt acknowledged that its financial statements for the restated periods were materially inaccurate and did not comply with GAAP and were therefore false and misleading when issued. 17 C.F.R. § 210.4-01(a)(1).

80.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

81.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Schmitt securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Schmitt, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Schmitt securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class. During the Class Period, average weekly trading volume averaged 110,621 shares, with 3.87 million shares currently outstanding. The

high average trading volume and weekly turnover creates a strong presumption in favor of market efficiency. Record owners and other members of the Class may be identified from records maintained by Schmitt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

84.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

85.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Schmitt;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Schmitt to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Schmitt securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

86. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

87. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Schmitt shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Schmitt filed periodic public reports;

- Schmitt regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Schmitt's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Schmitt was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

88.     Based on the foregoing, the market for Schmitt securities promptly digested current information regarding Schmitt from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

89.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**COUNT I**
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

90.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

91.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

92.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Schmitt securities during the Class Period.

94.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Schmitt were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Schmitt, their control over, and/or receipt and/or modification of Schmitt's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Schmitt, participated in the fraudulent scheme alleged herein.

95.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Schmitt personnel to members of the investing public, including Plaintiffs and the Class.

96.    As a result of the foregoing, the market price of Schmitt securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Schmitt securities during the Class Period in purchasing Schmitt securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

97.    Had Plaintiffs and the other members of the Class been aware that the market price of Schmitt securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Schmitt securities at the artificially inflated prices that they did, or at all.

98.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

99.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Schmitt securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

100.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    During the Class Period, the Individual Defendants participated in the operation and management of Schmitt, and conducted and participated, directly and indirectly, in the

conduct of Schmitt's business affairs. Because of their senior positions, they knew the adverse non-public information about Schmitt's false financial statements.

102.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Schmitt's financial condition and results of operations, and to correct promptly any public statements issued by Schmitt which had become materially false or misleading.

103.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Schmitt disseminated in the marketplace during the Class Period concerning Schmitt's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Schmitt to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Schmitt within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Schmitt securities.

104.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Schmitt.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)      awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 31, 2023

**THE ROSEN LAW FIRM, P.A.**
By:____/s/ Phillip Kim_____
Phillip Kim, Esq. (admitted *pro hac vice*)
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
            lrosen@rosenlegal.com

*Counsel for Plaintiff*

RANSOM, GILBERTSON, MARTIN &
RATLIFF, LLP
By:_____
Jeffrey S. Ratliff, OSB No. 893422
5441 S. Macadam Ave., Suite 301
Portland, OR 97239
Email: jeffreysratliff@gmail.com
T: 503-226-3664

*Liaison Counsel for Plaintiff*