UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LLOYD STEINBERG and SCOTT
MUSTRIC, Individually and on behalf
of all others similarly situated,

              Plaintiffs,

      v.

SCHMITT INDUSTRIES, INC., ANN M.
FERGUSON, MICHAEL R. ZAPATA, PHILIP
BOSCO, and JAMIE SCHMIDT,

              Defendants.

Case No. 3:22-cv-01533-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

Plaintiffs have brought this putative class action on behalf of themselves and other

similarly situated individuals who purchased publicly traded stock in Schmitt Industries, Inc.

("Schmitt" or the "company") between August 21, 2018, and September 20, 2022.  In addition to

Schmitt, plaintiffs have named the following individual defendants:

> Ann Ferguson, Chief Financial Officer "from at least the beginning of the class
> period to November 2019";

1 – FINDINGS AND RECOMMENDATIONS

Michael Zapata, Chief Executive Officer, President, and Executive Chairman since August 2019;

Philip Bosco, CFO and Treasurer since December 2020; and

Jamie Schmidt, CFO from January 2020 through December 2020.

Am. Compl. ¶¶ 14–17, ECF 28.  The complaint originally named former CEO David W. Case, but he has been voluntarily dismissed from the case.

Against all defendants, plaintiffs allege a claim under Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.  Plaintiff also asserts a claim against the individual defendants under Section 20(a) of the Act, 15 U.S.C. § 78t.

Defendants have filed a Motion to Dismiss and to Strike (ECF 30) in which they move to dismiss all claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and alternatively move to strike all allegations regarding nonpayment of state sales tax pursuant to Rule 12(f).  The motion to dismiss should be GRANTED in its entirety and this case should be dismissed with prejudice.

## I.    Rules 12(b)(6) and 12(f)

A Rule 12(b)(6) motion tests whether there is a cognizable legal theory or sufficient facts to support a cognizable legal theory.  *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015).  To survive a Rule 12(b)(6) motion, "the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 8(a)(2) (requiring that a claim for relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief").  In evaluating a motion to dismiss, the court must accept all well-pleaded material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving

2 – FINDINGS AND RECOMMENDATIONS

party.  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).  The court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party."  *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).  However, mere legal conclusions couched as a factual allegation are not entitled to an assumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  The decision to grant or deny a Rule 12(f) motion to strike is within the court's discretion.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

## II.      Relevant Law Regarding Securities Claims and Heightened Pleading Standards

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . .  any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).  Pursuant Section 10(b), the Securities and Exchange Commission promulgated Rule 10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce, or of the mails or of any facility of
> any national securities exchange,
>> **(a)** To employ any device, scheme, or artifice to defraud,
>> **(b)** To make any untrue statement of a material fact or to omit to state
>> a material fact necessary in order to make the statements made, in the light
>> of the circumstances under which they were made, not misleading, or
>> **(c)** To engage in any act, practice, or course of business which operates or
>> would operate as a fraud or deceit upon any person,
>> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant, (2) scienter, (3) a connection between the

3 – FINDINGS AND RECOMMENDATIONS

misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Section 20(a) "makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp. ("America West")*, 320 F.3d 920, 945 (9th Cir. 2003)). "This inquiry is normally an 'intensely factual question.'" *Id.* (quoting *Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir. 1996)). "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Id.* (citations omitted).

At the pleading stage, securities fraud cases, such as this one, are subject to the heightened standard of Federal Rule of Civil Procedure 9(b), which requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "Averments of fraud must be accompanied by 'the who, what, when, where, and how'

4 – FINDINGS AND RECOMMENDATIONS

of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

Also, the Private Securities Litigation Reform Act of 1995 ("PSLRA") "amended the Securities Exchange Act to require that a complaint 'plead with particularity both falsity and scienter.'" *Zucco*, 552 F.3d at 990 (citations omitted). "[T]o properly allege falsity, a securities fraud complaint must . . . 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed.'" *Id.* at 990-91 (quoting 15 U.S.C. § 78u-4(b)(1)). "For a statement to be false or misleading, it must directly contradict what the defendant knew at that time or omit material information." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (simplified).

The "complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco*, 552 F. 3d at 991 (citation omitted). "Deliberate recklessness" is "a form of intentional or knowing misconduct." *Id.* "[A]lthough facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness." *Id.* (emphasis in original). "Rather, the plaintiff must plead 'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (citation omitted).

5 – FINDINGS AND RECOMMENDATIONS

"To adequately plead scienter, the complaint must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco*, 552 F.3d at 990 (quoting 15 U.S.C. § 78u–4(b)(2)). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks omitted). In assessing the sufficiency of scienter allegations, the court must "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citing *Tellabs*, 127 S.Ct. at 2509).

In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.*, 552 F.3d at 991 (quoting *Tellabs*, 127 S.Ct. at 2510). *Id.* This "inquiry is inherently comparative." *Id.* "[A] securities fraud complaint will survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) 'only if a reasonable person would deem the inference of scienter *cogent and at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (emphasis in original). "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Id.*

In evaluating scienter allegations, the court first "determine[s] whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter[.]" "[S]econd, if no individual allegations are sufficient, [the court] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

6 – FINDINGS AND RECOMMENDATIONS

### III.    Request for Judicial Notice

Plaintiffs have filed a Request for Judicial Notice, ECF 36, to which defendants have filed a partial opposition.  ECF 39.  Defendants argue that plaintiffs have provided selective excerpts of the relevant SEC filings, and ask the court to consider additional portions.

This court may take judicial notice of SEC filings.  *See Dreiling v. Am. Exp. Co.,* 458 F.3d 942, 946 n.2 (9th Cir. 2006) (recognizing the court "may consider documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings").  Thus, the court takes judicial notice of the entirety of the SEC filings referenced in the Amended Complaint and the parties' briefing.

Defendants also object to Exhibit 12, which is a December 19, 2022 press release, and Exhibit 13, which is a June 16, 2023 article, both of which relate to Ample Hills Creamery ("Ample Hills"), which Schmitt bought out of bankruptcy in July 2020.  The press release indicates that, "[b]y December 2022, all Ample Hills locations would be indefinitely shut down," and the article states that Schmitt sold Ample Hills for a fraction of what it paid.  In plaintiffs' request for judicial notice, they ask the court to consider the documents not "for their truth, but only for their existence."  Pls. Req. Judicial Not. 2, ECF 36.  But in their opposition to the motion to dismiss, plaintiffs seem to rely on the events that are described in these documents. Opp. 4, ECF 35.  Nevertheless, plaintiffs could have alleged these facts in their Amended Complaint.  Moreover, even if these facts are considered, it does not affect the outcome of the motion to dismiss, as discussed in detail below.

All of Schmitt's SEC filings can be found by conducting a company name search at https://www.sec.gov/edgar/searchedgar/companysearch.  The forms discussed herein and the respective links to these forms are set forth in the table below:

7 – FINDINGS AND RECOMMENDATIONS

| 10-K Forms (by Fiscal Year) | 10-Q Forms | 8-K Forms | Period Ending Date | Filing Date | Defendant Signatories |
|---|---|---|---|---|---|
| 2018  10-K | | | 05-31-2018 | 08-21-2018 | Ferguson |
| 2019  10-K | | | 05-31-2019 | 08-21-2019 | Zapata, Ferguson |
| 2020  10-K | | | 05-31-2020 | 08-31-2020 | Zapata, Schmidt |
| | | | | | |
| | 2021  Q1 | | 08-31-2020 | 10-30-2020 | Schmidt |
| | 2021  Q2 | | 11-30-2020 | 01-14-2021 | Bosco |
| | 2021  Q3 | | 02-28-2021 | 04-22-2021 | Bosco |
| | | | | | |
| 2021  10-K | | | 05-31-2021 | 08-31-2021 | Zapata, Bosco |
| | | | | | |
| | 2022  Q1 | | 08-31-2021 | 10-20-2021 | Bosco |
| | 2022  Q2 | | 11-30-2021 | 01-14-2022 | Bosco |
| | 2022  Q3 | | 02-28-2022 | 04-14-2022 | Bosco |
| | | | | | |
| | | 8-K | | 09-20-2022 | Bosco |
| | | | | | |
| 2022  10-K | | | 05-31-2022 | 10-13-2022 | Zapata, Bosco |

To promote clarity, certain excerpts from these forms are also linked.

## IV.    Sales Tax

First, defendants move to dismiss or, alternatively, strike plaintiffs' allegations related to the failure to pay sales tax.  Mot. Dismiss 9, ECF 30.

### A.    Background

In the Amended Complaint, plaintiffs allege that Schmitt failed to pay sales tax for years, "going as far back as the 1980s."  Am. Compl. ¶ 4, ECF 28.  Plaintiffs claim that, because Schmitt was not paying sales tax, statements contained in the 2018 Form 10-K and 2019 Form 10-K—specifically, representations that (1) the "preparation of the consolidated financial statements" were "in conformity with" generally accepted accounting principles ("GAAP"), and (2) "our management concluded that our internal controls over financial reporting were effective"—were false and/or misleading.  Id. ¶¶ 32, 36.

Plaintiffs make the same argument with respect to the 2020 Form 10-K, which contains a similar statement that it was "prepared in accordance with" the GAAP. *Id.* ¶¶ 38-39. In the 2020 Form 10-K, Schmitt also disclosed: "We have identified a material weakness in our internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements." (Emphasis omitted.) The form further stated: "[O]ur management concluded that our internal controls over financial reporting were not effective as of May 31, 2020," and "we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties; and ineffective management review over the accounting reconciliations including accounting for inventory accrued liabilities and taxes." *Id.* ¶ 40. Plaintiffs contend "[t]his announcement continued to hide from investors the fact that Schmitt had not paid any sales tax since the 1980s." *Id.* ¶ 41.

To counter this allegation, defendants point to other portions of the 2020 Form 10-K, which disclose that Schmitt determined in the fourth quarter of 2020 that "it was more likely than not" it had a "pre-existing tax liability" of $265,349 "related to prior periods":

> In Q4 of Fiscal 2020, the Company determined that it was more likely than not that the Company had a pre-existing tax liability related to prior periods. The Company has analyzed the liability and estimated it to be $265,349 as of May 31, 2020.

Mot. Dismiss, Ex. A at 6-7, ECF 30-1. Also, defendants note that following its acquisition of Ample Hills in July 10, 2020, Schmitt reported its sales tax liability, specifically, the 10-Q forms for Q1, Q2, and Q3, and 2021 Form 10-K indicate that "[s]ales tax is collected from customers and remitted to governmental authorities" and "presented on a net basis within revenue" in the consolidated and combined statements of operations. *Id.*, Ex. A at 9, 11, 13, 16, ECF 30-1.

9 – FINDINGS AND RECOMMENDATIONS

The following year, the 2021 Form 10-K disclosed under "Item 9A-Controls and Procedures" that "our management concluded that our internal controls over financial reporting were not effective as of May 31, 2021." Am. Compl. ¶ 47, ECF 28. The 2021 Form 10K further explained:

> Our CEO and CFO concluded that we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties, as well as insufficient and imprecise management review controls in the financial close process relating to the accounting for stock-based compensation, accounts receivable, accounts payable, inventory. accrued liabilities, sales taxes, expense classification, depreciation of propertv and equipment, and earnings per share. In addition, the Company has insufficient number of qualified accounting personnel governing the financial close and reporting process.
>
> * * *
>
> Notwithstanding the identified material weaknesses, management believes that the Consolidated Financial Statements included in this Annal [sic] Report on Form 10-K present fairly, in all material respects, our financial position, results of operations, and cash flows as of and for the periods presented in accordance with U.S. GAAP.

Id. Schmitt again represented that its financial statements were "prepared in accordance with" the GAAP. Id. ¶ 45. Plaintiffs contend that these statements were "false and/or misleading when made because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with GAAP because Schmitt was not paying sales taxes." Id. ¶ 48.

Plaintiffs further allege that when Schmitt filed its Form 10-Q for the first, second, and third quarters of the 2022 fiscal year, it "had still not resolved its outstanding issues concerning unpaid sales tax" and continued to make false and/or misleading representations that the financial statements were "in accordance" with the GAAP when sales taxes had not been paid. Id. ¶ 55. In the Q1, Q2, and Q3 reports, Schmitt reiterated that, "[a]s previously disclosed in Item 9A of our Annual Report on Form 10-K for the year ended May 31, 2021, management had concluded that there was a material weakness in internal control over financial reporting due to

10 – FINDINGS AND RECOMMENDATIONS

deficiencies in the design and operation of internal controls over segregation of duties" and "ineffective management review over accounting reconciliations for . . . sales taxes[.]" Mot. Dismiss, Ex. A at 21, 24, 27, ECF 30-1. The reports also stated, "We are in the process of remediating the material weakness as of the end of the period covered by this Quarterly Report on Form 10-Q." *Id.*

Finally, plaintiffs allege that Former Employee ("FE") 2, who was Schmitt's accounting manager from October 2021 to December 2022, has "explained that the issues concerning sales tax were well known even before FE2 started with the Company, and that the issue was still ongoing when FE2 left in December 2022." Am. Compl. ¶¶ 25, 36, ECF. Plaintiffs allege the "FE4 also corroborated that Schmitt's non-payment of sales tax was an issue." *Id.* ¶ 73.

### B. Analysis

Even accepting plaintiffs' allegations as true, they fail to meet the heightened pleading standard required for a securities fraud action. Plaintiffs have not alleged that defendants knew of a sales tax obligation and failed to disclose it. Also, plaintiffs have failed to allege the required element of loss causation.

As defendants correctly observe, Schmitt historically had no obligation to pay sales taxes in Oregon, which imposes no sales tax. Schmitt also had no obligation to pay sales tax in states where it had no physical presence, until the Supreme Court decided *South Dakota v. Wayfair*, 138 S.Ct. 2080 (2018). In *Wayfair*, the Supreme Court overruled the physical presence rule and adopted a "substantial nexus" test, which inquires whether the business "'avails itself of the substantial privilege of carrying on business' in that jurisdiction." 138 S.Ct. at 2099 (citation omitted).

11 – FINDINGS AND RECOMMENDATIONS

In the Amended Complaint, plaintiffs allege that Schmitt's financial statements "were false and/or misleading because, at the time the statements were made, Schmitt was not preparing its financial statements in conformity with the GAAP because Schmitt was not paying sales taxes." Am. Compl. ¶¶ 33, 36, 39, 41, 46, 48, ECF 28. Defendants also allege that "[t]he failure to pay sales tax rendered Schmitt's statements about its purported effective internal controls over financial reporting materially false and misleading." *Id.* ¶¶ 33, 36, 39. In their opposition to the motion to dismiss, plaintiffs raise an additional theory, i.e., that defendants "failed to disclose their known, impending sales tax liabilities to investors for over two years." Opp. 1, ECF 35. Plaintiffs contend that "[b]y failing to alert shareholders of a known, pending liability, Schmitt failed to inform shareholders of information which may affect the overall economic health of the Company." *Id.* at 9.

Both sides cite to the Financial Accounting Standards Board, Accounting Standards Codification ("ASC") 450-20-25-2 to frame the analysis. Reply 17 n.4, ECF 38; Pls. Suppl. Authority 2, ECF 44. ASC 450-20-25-2 states:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
> 
> a.    Information available before the financial statements are issued or are  available to be issued (as discussed in Section 855-10-25) indicates that it is *probable* that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be *probable* that one or more future events will occur confirming the fact of the loss.
> 
> b.    The amount of loss can be *reasonably estimated*.

12 – FINDINGS AND RECOMMENDATIONS

*Id.* (emphasis added).[1]  "The purpose of those conditions is to require accrual of losses when they are reasonably estimable and relate to the current or a prior period."  *Id.*  ASC 450-20-50-1 further provides that "[d]isclosure of the nature of an accrual made pursuant to the provisions of paragraph 450-20-25-2, and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading."[2]

---

[1] A loss contingency is:

> An existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses.

ASC 450-20-20.  The definition of "probable" is that "[t]he future event or events are likely to occur."  *Id.*

[2] Plaintiffs do not cite to ASC 450-20-50-3, which does not appear applicable.  ASC 450-20-50-3 states that where "[a]n accrual is not made for a loss contingency because any of the conditions in paragraph 450-20-25-2 are not met"—i.e., the loss is not probable or the amount cannot be reasonably estimated—"[d]isclosure of the contingency shall be made if there is at least a reasonable possibility that a loss or an additional loss may have been incurred."  This provision, however, is restricted by ASC 450-20-50-6, which provides:

> Disclosure is not required of a loss contingency involving an unasserted claim or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless both of the following conditions are met:
>     a.   It is considered probable that a claim will be asserted.
>     b.   There is a reasonable possibility that the outcome will be unfavorable.

*Id.*  Thus, courts have explained:

> Even when there is a reasonable possibility of a loss, however, disclosure need not always be made. Disclosure is not required for a reasonably possible loss when it is "a loss contingency involving an unasserted claim or assessment if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless both" (a) "[i]t is considered probable that a claim will be asserted" and (b) "[t]here is a reasonable possibility that the outcome will be unfavorable."

As defendants observe, the *Wayfair* decision did not impose an immediate tax liability on Schmitt. Moreover, plaintiffs have failed to allege that defendants knew of a probable tax liability and an amount of loss that could be reasonably estimated.

In *Feola v. Cameron*, the plaintiff-shareholders alleged that the defendant-officers of a publicly-owned appliance recycling company violated Section 10(b) when they "knowingly issued quarterly and annual reports, SEC filings and press releases that overstated company earnings" and "did not account for uncollected sales taxes." No. LACV1501654JAKAJWX, 2015 WL 12644566, at *5 (C.D. Cal. Nov. 24, 2015). The plaintiffs-shareholders brought suit after the company issued a press release in which it disclosed that its sales tax payments were being examined by the California Board of Equalization. Following the press release, shares declined by more than 27%. *Id.* at *2. In the press release, the company explained that it had believed its transactions were tax exempt in California. *Id.* The district court granted defendants' motion to dismiss, finding there was no "strong inference" of scienter. *Id.* Among other points, the district court observed that the complaint failed to allege "what did Defendants know and believe about sales tax requirements." *Id.*

---

*In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 582 (S.D.N.Y. 2020) (citing ASC 450-20-50-6) (emphasis in original); *see also Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) ("The 'probability' standard applies in lieu of the 'reasonable possibility' standard only if the loss contingency arises from 'an unasserted claim or assessment when there has been *no* manifestation by a potential claimant of an awareness of a possible claim or assessment.'"); *Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 19 (D.D.C. 2017) ("With respect to claims that have not yet been asserted, disclosure is not required 'if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment' unless: (1) '[i]t is considered probable that a claim will be asserted,' and (2) '[t]here is a reasonable possibility that the outcome will be unfavorable.'") (citing ASC 450–20–50–6);

Here, plaintiffs have not alleged that there was a possible claim or assessment, or that it was probable that a claim would be asserted and there was a reasonable possibility that the outcome would be unfavorable. Thus, the "probable" standard set forth in ASC 450-20-25-2, which is cited and relied upon by the parties, applies.

14 – FINDINGS AND RECOMMENDATIONS

Similarly, here, plaintiffs have not alleged what any of the individual defendants knew and believed about the company's sales tax requirements post *Wayfair*. As defendants contend, there is "no witness statement or other specific allegation of contemporaneous knowledge by individual defendants that a sales tax liability existed and was undisclosed at the time of the filings at issue." Reply 16, ECF 38. In 2020 Form 10K, which covered the fiscal year ending on May 31, 2020, the company disclosed it had "determined that it was more likely than not that the Company had a pre-existing tax liability related to prior periods" and it had "analyzed the liability and estimated it to be $265,349 as of May 31, 2020." This determination was made "in Q4 of Fiscal 2020," i.e., during the three months immediately preceding the end of the 2020 Form 10K reporting period. Plaintiffs allege no facts showing that before Q4 of fiscal year 2020, any of the defendants knew that Schmitt, an Oregon company that had not paid sales tax for decades, had a sales tax liability. To the extent plaintiffs contend that defendants should have known about any sales tax obligations, that "is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim." *In re Watchguard Sec. Litig.*, No. C05-678LR, 2006 WL 2927663, at *10 (W.D. Wash. Oct. 12, 2006).

To bolster their position, defendants offer some information regarding the uncertain legal landscape following the *Wayfair* decision. Defendants explain that, after *Wayfair* was decided, "it took some time for states with sales taxes to adopt requirements for out-of-state businesses." Mot. Dismiss 11, ECF 30. Defendants contend that a "patchwork of state-by-state implementations followed," and "businesses faced a daunting challenge in navigating a constantly changing landscape of sales tax requirements across the country." *Id.* at 11-12.

15 – FINDINGS AND RECOMMENDATIONS

Indeed, much has been written about the aftermath of the *Wayfair* decision.  One author characterized *Wayfair* as "[t]he case that changes everything," observing that "the bright line is gone" and "replaced by ambiguity as to what 'substantial nexus' means."  Steven M. Hogan & Alan J. LaCerra, *South Dakota v. Wayfair: The Case That Changes Everything*, Fla. B.J. 22, 26, March/April 2019.

Following *Wayfair*, retailers faced a "myriad of particular state and local sales and use tax laws and rates," in addition to "various forms of nexus and dollar/sales minimums required in each state in order to determine whether there [was] an obligation to collect taxes and file returns."[3]  Norman S. Newmark, Rochelle Friedman Walk, Robert V.  Willeford, Jr., *Cross Border State Sales and Use Taxation After South Dakota v. Wayfair: A New Paradigm for E-Commerce*, 3 Bus. Entrepreneurship & Tax L. Rev. 16, 25 (2019).  In addition to South Dakota's "economic nexus" that was at issue in *Wayfair*, some states have "affiliate," "click-through," or "marketplace" nexus, and "many states have a combination of various kinds of nexus statutes," as well as different dollar and transaction thresholds.  *Id.*  Following the *Wayfair* decision, "more states [were] likely to adopt economic nexus requirements as approved by the Court in *Wayfair* under various effective dates, making state laws a 'moving target' and thus adding yet another level of complexity to the mix for small retailers."  *Id.*

But even without this context, plaintiffs have failed to allege that defendants knew about the Supreme Court's decision in *Wayfair* or were otherwise aware that Schmitt had a sales tax

---

[3] *See also* Mot. Dismiss 11, ECF 11 ("At the time of the *Wayfair* decision, 45 states and the District of Columbia had sales and use tax statutes, and 38 of those collected for jurisdictional subdivisions such as counties which had their own sales taxes. Some states had more than a thousand local jurisdictions imposing their own sales taxes.") (citing Eugene T. Maccarrone, *The Impact of the U.S. Supreme Court's Decision in South Dakota v. Wayfair: Compliance Challenges for Small and Medium-Sized Businesses*, CPA JOURNAL (Apr. 2021)).

obligation that was probable and could be reasonably estimated. The most that plaintiffs have alleged is that FE2 "explained that the issues concerning sales tax were well known even before FE2 started with the Company, and that the issue was still ongoing when FE2 left in December 2022." Am. Compl. ¶ 36, ECF 28. Plaintiffs generally allege that "FE4 also corroborated that Schmitt's non-payment of sales tax was an issue." *Id.* ¶ 73.

These vague allegations are insufficient to establish a strong inference that defendants acted with the mental state to deceive, manipulate, or defraud. It is unclear what "issues" were discussed and whether any of the defendants discussed them. Moreover, "[a] general discussion does not in itself indicate" fraud. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1240 (S.D. Cal. 2010).

It is also unclear how long the sales tax issues were allegedly "well-known" before FE2 began working at Schmitt. In fact, FE2 did not begin working at Schmitt until October 2021, long after it was determined in Q4 of fiscal year 2020 that there were pre-existing tax liabilities and the disclosures in the 2020 Form 10-K were made. Also, after Schmitt acquired Ample Hills in July 2020, it reported in the Q1, Q2, and Q3 reports for fiscal year 2021 that it was collecting sales tax from customers and remitting them to governmental authorities. Thus, it is not surprising that when FE2 joined Schmitt thereafter in October 2021, "issues concerning sales tax" were being discussed.

Plaintiffs also fault defendants for failing to specify that the $265,249 tax liability listed on the 2020 Form 10-K was for sales tax and included it under operating expenses rather than characterizing it as a liability. Opp. 9, ECF 35. Plaintiffs contend that "[p]ayments of sales taxes collected from customers do not constitute a company's expense because the company

17 – FINDINGS AND RECOMMENDATIONS

does not use its own assets to pay sales taxes, rather it uses funds it collected from customers." Opp. 3, ECF 35.

17 C.F.R. § 210.4-01(a)(1) states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." However, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir. 2002) (citation omitted); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 829 (S.D. Cal. 2006), *aff'd sub nom. In re Adecco S.A. Sec. Litig.*, 256 F. App'x 74 (9th Cir. 2007) (holding "a failure to follow GAAP, without more, does not establish scienter").

Here, the 2020 Form 10-K listed the $265,249 under "operating expenses." 2020 Form 10-K at 16. However, the form also described the taxes as "accrued taxes" that were "related to . . . estimated tax liabilities," *id.*, and "accrued liabilities" relating to a "pre-existing tax liability related to prior periods." *Id.* at 27. Thus, the 2020 Form 10-K made clear that the $265,249 was some form of a liability. Moreover, characterizing the $265,249 as an operating expense that would have to be paid from company assets rather than funds collected from customers, overcompensated for the tax burden that Schmitt was facing, if anything. *See Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) (finding that where "accounting irregularities actually understated the company's net income," it was "hardly support for an inference that [the defendants] were wrongly trying to inflate the company's worth and enrich themselves through accounting misdeeds"). This does not amount to a "highly unreasonable omission" that

18 – FINDINGS AND RECOMMENDATIONS

constitutes an "extreme departure from the standards of ordinary care" and "presents a danger of misleading buyers or sellers." *Zucco*, 552 F. 3d at 991.

When offered the opportunity to provide additional authority to support their arguments, plaintiffs cited to 17 C.F.R. § 229.303(b)(2)(ii), which creates a duty for defendants to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Pls' Supp. Authority 1, ECF 44. Plaintiffs did not allege this theory in their Amended Complaint. But, again, there are no allegations that any individual defendants knew about a sales tax obligation that they failed to disclose.

Finally, and importantly, plaintiffs have failed to allege that defendants' actions caused plaintiffs a loss. "Loss causation is the causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342 (2005). "The complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Investment v. Corinthian Colleges,* 540 F.3d 1049, 1063 (9th Cir. 2008). "To adequately plead loss causation, . . . a plaintiff must allege that the 'share price fell significantly after the truth became known.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (quoting *Dura Pharms.,* 544 U.S. at 344–45).

Plaintiffs allege that, as the result of defendants' violations, the market price of Schmitt securities was artificially inflated during the class period during which they purchased the shares. Am. Compl. ¶ 96, ECF 28. But there are no allegations that the stock price fell following Schmitt's disclosure of a $265,349 pre-existing tax liability in the 2020 Form 10-K filed on August 31, 2020. Instead, the Amended Complaint alleges that share prices did not fall until

19 – FINDINGS AND RECOMMENDATIONS

over a year later, by 3% on September 1, 2021, and 1.9% on October 21, 2021, and did not fall by 17% until September 21, 2022. *Id.* ¶¶ 5, 49, 50, 78, ECF 28. As such, plaintiffs have failed to sufficiently allege that they suffered a loss caused by defendants' purported misrepresentations regarding sales taxes.

## V.    Internal Controls and Ample Hills Creamery

Plaintiffs' remaining allegations pertain to alleged misrepresentations regarding Schmitt's internal controls and the purchase and management of Ample Hills.

### A.    Background

#### 1.    Internal Controls

Plaintiffs rely on some of the same portions of the financial statements to support their claim related to internal controls. Plaintiffs again point to Schmitt's 2018 Form 10-K, which stated "our management concluded that our internal controls were effective as of May 31, 2018," and the 2019 Form 10-K, which similarly stated "our management concluded that our internal controls over financial reporting were effective as of May 31, 2019."

Then, as previously noted, Schmitt filed its 2020 Form 10-K, in which it disclosed: "We have identified a material weakness in our internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements." (Emphasis omitted.) The form further stated: "[O]ur management concluded that our internal controls over financial reporting were not effective as of May 31, 2020," and "we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties; and ineffective management review over the accounting reconciliations including accounting for inventory accrued liabilities and taxes." The

20 – FINDINGS AND RECOMMENDATIONS

form described what a material weakness was and its effect on the timely reporting of material

misstatements:

> A material weakness is defined as a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. As a result of this material weakness, our management concluded that our internal control over financial reporting was not effective.

The form also explained that "[m]anagement has developed a remediation plan," described some

components of the remediation plan, and stated, "We anticipate that these plans will be fully

implemented and tested during 2021 such that our internal control deficiency will be remediated

in that timeframe."

The 2021 Form 10-Q for Q3, filed on April 22, 2021, reiterated the disclosures made in

the 2020 Form 10-K, and stated that Schmitt continued to be "in the process of remediating the

material weakness."  The form also disclosed additional material weaknesses, including the lack

of qualified accounting personnel:

> During the quarter ended February 28, 2021, management identified additional material weaknesses due to deficiencies in the design of internal controls as follows:
> - The Company has insufficient and imprecise management review controls in the financial close process relating to the accounting for stock based compensation, accounts receivable, accounts payable, inventory, accrued liabilities, income taxes, expense classification, depreciation of property and equipment, and earnings per share, and
> - The Company has insufficient number of qualified accounting personnel governing the financial close and reporting process.

The form indicated that "[m]anagement intends to leverage additional accounting resources, both

internal and external, to strengthen the financial close and reporting process so as to more

effectively detect such misstatements in a more timely fashion."  It further explained: "The

remediation plan includes both management's assessment and recommendations from

21 – FINDINGS AND RECOMMENDATIONS

independent accounting advisors used in the review process.  This remediation plan is intended to address the identified material weaknesses and enhance our overall control environment."

The 2021 Form 10-K filed on August 31, 2021, again disclosed: "We have identified a material weakness in our internal control over financial reporting which could, if not remediated, result in material misstatements in our financial statements."  (Emphasis omitted.)  It described the material weakness, reiterating that there were insufficient qualified accounting personnel:

> Our CEO and CFO concluded that we have a material weakness in internal control over financial reporting due to deficiencies in the design and operation of internal controls over segregation of duties, as well as insufficient and imprecise management review controls in the financial close process relating to the accounting for stock-based compensation, accounts receivable, accounts payable, inventory, accrued liabilities, sales taxes, expense classification, depreciation of property and equipment, and earnings per share. In addition, the Company has insufficient number of qualified accounting personnel governing the financial close and reporting process.
>
> . . . As a result of the material weakness, our CEO and CFO have concluded that, as of May 31, 2021 the end of the period covered by this report, our disclosure controls and procedures were not effective at a reasonable assurance level.

The company described the remediation efforts, including the use of additional internal and external accounting resources, to more timely detect misstatements, but warned that remediation might not be successful and that there was the possibility of future restatements:

> As a result of our material weaknesses, management concluded that our internal control over financial reporting was not effective. We are actively engaged in a remediation plan designed to address these material weaknesses. Management intends to leverage additional accounting resources, both internal and external, to strengthen the financial close and reporting process so as to more effectively detect such misstatements in a more timely fashion. The remediation plan includes both management's assessment and recommendations from independent accounting advisors used in the review process. This remediation plan is intended to address the identified material weaknesses and enhance our overall control environment.
>
> If our remedial measures are insufficient to address the material weaknesses, or if additional material weaknesses or significant deficiencies in our internal control are discovered or occur in the future, our Consolidated Financial Statements may

contain material misstatements and we could be required to restate our financial results. We can give no assurance that the measures we have taken and plan to take in the future will remediate the material weakness identified or that any additional material weaknesses or restatements of financial results will not arise in the future due to a failure to implement and maintain adequate internal control over financial reporting or circumvention of these controls. In addition, even if we are successful in strengthening our controls and procedures, in the future those controls and procedures may not be adequate to prevent or identify irregularities or errors or to facilitate the fair presentation of our financial statements.

The form also described "substantial doubt as to the Company's ability to continue as a going concern":

### *Going Concern Assessment*

As described in Note 2 to the consolidated financial statements, the Company has realized a net loss for the year ended May 31, 2021 and has negative cash flows from operating activities as of May 31, 2021. The Company determined these, and other factors, raised substantial doubt as to the Company's ability to continue as a going concern one year from the issuance date of the consolidated financial statements. The Company believes that the projected cash flows from continuing operations, existing cash on hand as of May 31, 2021 and access to a $1.3 million line of credit are sufficient to fund operations and pay operating expenses for at least one year following the issuance of these consolidated financial statements, which alleviates any substantial doubt about the Company's ability to continue as a going concern. In making this determination, management prepared a one-year cash flow projection. Management used significant assumptions in preparing the one-year cash flow projection, which included expected operating costs and financing obligations.

The day after the 2021 Form 10-K was filed on August 31, 2021, Schmitt's share price fell by approximately 3%. Am. Compl. ¶ 50, ECF 28.

The Form 10-Q for Q1, also filed on August 31, 2021, referenced previous disclosures regarding material weakness in internal controls, and indicated, "We are in the process of remediating the material weakness[.]" It also stated, "[a]s a result of the material weakness, our CEO and CFO have concluded that, as of August 31, 2021, the end of the period covered by this report, our disclosure controls and procedures were not effective at a reasonable assurance

23 – FINDINGS AND RECOMMENDATIONS

level." The Form 10-Q for Q2 ending on November 30, 2021, and the Form 10-Q for Q3 ending on February 28, 2022, contained essentially the same disclosures.

Schmitt did not file a 2022 Form 10-K by the August 31, 2022 deadline.[4] On September 20, 2022, Schmitt filed a Form 8-K, in which it disclosed that, on September 19, 2022, the Audit Committee of the Board of Directors concluded that the financial statements for Q1, Q2, and Q3 of the fiscal year ending May 31, 2022, should not be relied upon and required restatement. The Form 8-K disclosed that the quarterly financial statements contained errors in that (1) the Q1 form under-recognized expenses by $559,818, (2) the Q2 form over-recognized expenses by $353,048, and (3) the Q3 form under-recognized expenses by $123,433, resulting in a "cumulative" misstatement of "$330,203 in under-recognized expenses" for those three quarters. The Form 8-K described that the errors were caused by the "ineffective application of cut-off procedures" that resulted in the "exclusion of certain general and administrative expenses from the statement of operations":

> The Company has determined that it made certain errors due to the ineffective application of cut-off procedures resulting primarily in the exclusion of certain general and administrative expenses from the statement of operations in the Company's financial statements during the fiscal year ended May 31, 2022. The Company will therefore restate its previously filed quarterly financial statements for periods from August 31, 2021 forward, as described further below. The Company currently estimates that the errors were material on a cumulative basis resulting in a net $330,203 under-recognition of expenses over the first three quarters of the fiscal year. Specifically, the Company estimates a Q1 under-recognition of expenses by $559,818, a Q2 over-recognition of expenses by $353,048, and a Q3 under-recognition of expenses by $123,433.
>
> . . . The Company is currently determining the exact amounts and full effect of the errors in the financial statements covering the Non-Reliance Periods. The Company's preliminary estimate is that, as of May 31, 2022, the cumulative effect of these errors is a misstatement of $330,203 in under-recognized expenses during the first three quarters of its fiscal year; however such amount is subject to revision as the Company finalizes its analysis.

---

[4] Schmitt filed the 2022 Form 10-K on October 13, 2022.

24 – FINDINGS AND RECOMMENDATIONS

The Form 8K stated that the company's management and the Audit Committee had discussed these matters with the company's independent registered accounting firm, the company was "working to complete the restatement of its financial statements" for those quarters, and an amended Form 10-Q would be filed for each of those quarters. The form cautioned that previously-filed documents for those periods "should no longer be relied upon," and "investors and others should rely only on financial information and other disclosures regarding the Non-Reliance Periods once the Company restates its financial statements for the Non-Reliance Periods." The form further disclosed that "[t]he Company expects to report at least one material weakness following completion of its analysis of the cause of these restatements," and "believes that its internal control over financial reporting was not effective and its disclosure controls and procedures were not effective for the" three quarters.

After the Form 8-K was issued on September 20, 2022[5], Schmitt's share price fell by 17%, and closed at $3.12 per share on September 21, 2022. Am. Compl. ¶ 78, ECF 28.

### 2.    Ample Hills Creamery

Plaintiffs allege that "the sorry state of Schmitt's internal audit and control process was further exacerbated by its acquisition of Ample Hills on July 10, 2020." Am. Compl. ¶ 6, ECF 28. Plaintiff faults "Schmitt, which had long been a high precision test and measurement products company," because it "had no experience in the retail ice cream business." *Id.*

Schmitt's filings indicate that it purchased Ample Hills, including "multiple intangible assets" such as "the names and marks, proprietary recipes, and company website," to further the company's strategy of "utilizing its capital for value opportunities." 2021 Form 10-Q for Q1.

---

[5] September 20, 2022, is the end of the class period.

"[T]he primary purpose of the Ample Hills acquisition was to capitalize on this strategy by purchasing a business with a good brand name, which in light of the price [it] paid in bankruptcy, could have a significant upside." *Id.*

In the 2021 Form 10-K, Schmitt similarly described that Ample Hills was "acquired . . . in connection with our growth strategy to acquire other businesses." Schmitt cautioned, however, that there were "Risks Related to Ample Hills," and that acquiring businesses "may be unsuccessful and could adversely affect our business and results." It warned that "there is no assurance that we will be able to . . . successfully integrate the business of acquired companies to realize the full benefits of the combined businesses," and "there is no assurance that our combined business will become profitable." Additionally, it disclosed:

> The process of completing the integration of acquired businesses could cause an interruption of, or loss of momentum in, the activities of our company and the loss of key personnel. The diversion of management's attention and any delays or difficulties encountered in connection with the pursuit of business acquisitions and the integration of acquired businesses, and the incurrence of significant, acquisition related costs in connection with proposed and completed acquisitions, could have an adverse effect on our business, financial condition or results of operations.

Approximately one year after purchasing Ample Hills, the 2022 Form 10-Q for Q1 ending on August 31, 2021, and filed on October 20, 2021, disclosed that "[m]anagement has performed a thorough evaluation of the pre-bankruptcy books and found the records to not be auditable," and that "management has engaged a third party consultant to assist in evaluating alternative means by which to provide historic financial data in future periods." Following this report, Schmitt's share prices fell by $0.08, or approximately 1.9%, to close at $3.82 on October 21, 2021. Am. Compl. ¶ 57, ECF 28.

Plaintiffs allege that "[e]ven though Schmitt had the opportunity to review Ample Hills' books and records prior to purchase, Schmitt failed to disclose risks associated with Ample Hills'

26 – FINDINGS AND RECOMMENDATIONS

accounting practices - notably, that Ample Hills' records were in such shambles that it would eventually be deemed 'not auditable.'" *Id.* ¶ 43.  In particular, plaintiffs claim defendants should have disclosed these deficiencies in the 2020 10-K Form for period ending May 31, 2020, and the 2021 10-K Form for the period ending May 31, 2021.  *Id.* ¶¶ 43, 48.

### 3.    Statements from Former Employees

To support these claims, plaintiffs offer the following statements from Schmitt's former employees:

FE3 "worked at Ample Hills for the original owners as an Events Operation Coordinator.  When Schmitt purchased Ample Hills, FE3 became the Order Management and Purchasing Manager.  FE3 worked at Ample Hills from October 2019 to January 2023.  FE3 shared an office space with Defendant Bosco."  Am. Compl. ¶ 26, ECF 28.  "According to FE3, as Ample Hills was being audited, more and more discrepancies would be uncovered along the way.  As an example, FE3 explained that a lot of items were not being coded properly, such as beverages sold in stores being coded in the general ledger as 'Water Utilities.'"  *Id.* ¶ 70.  FE3 stated that "Zapata's management of Ample Hills was 'on a whim rather than a plan,' and explained that, even as Ample Hills appeared to be headed for a downfall, management did not take steps, such as a hiring freeze or a cap on spending, to address Ample Hills' financial issues."  *Id.*

FE1, who was Schmitt's Corporate Controller from September 2020 to May 2022, and reported to Bosco, "corroborated FE3's account, explaining that, during FEI's tenure, Ample Hills 'never made money,'" "was always at a loss," and was "burning more money than they were making, at a phenomenal rate."  *Id.* ¶ 71.

FE4 "was an Accounting Manager at Schmitt from April 2021 to April 2022. One of FE4's responsibilities was to review all the cash that had cleared the bank, post it against the outstanding checks, and provide the CFO and controller with a weekly or periodic cash balance. FE4 was the one who warned Defendant Bosco as Schmitt got closer to a zero cash position." *Id.* ¶ 27. FE4 "reconciled Ample Hills' cash on a daily basis" and "explained that Ample Hills was not profitable." *Id.* ¶ 72. "According to FE4, between Schmitt's core business and Ample Hills, the Company was losing $1 million to $2 million every month." *Id.* "Additionally, FE4 explained that both Accounts Payable and Accounts Receivable were ineffective, and that there were a lot of broken processes at Schmitt. As an example, FE4 explained that when they first joined Schmitt in April 2021, the Company was three months behind on month-end close. FE4 explained that an Accounts Payable manager would reprocess any bounced payments instead of voiding the payment in the system, resulting in double or triple payments. FE4 described Accounts Receivable as a mess, with extensive and outstanding accounts receivable." *Id.* ¶ 73.

As previously noted, FE2 was Schmitt's Accounting Manager from October 2021 to December 2022. *Id.* ¶ 25. "FE2 is a Certified Public Accountant and a Certified Fraud Examiner." *Id.* "FE2 explained that, when they joined Schmitt in October 2021, the Accounts Payable team was 'following procedures established by people that didn't know accounting.' FE2 explained that, per GAAP, invoices should be booked at the time the service is rendered. Instead, Schmitt waited until they received the bill to record the payment. According to FE2, this was wrong, and . . . the proper procedure would have been to 'record[] an estimate, reverse it, and then record[] the new amount' upon receiving the bill." *Id.* ¶ 74.

FE5, who is a Certified Public Accountant, "was an Accounting Manager at Ample Hills from October 2021 to January 2023." *Id.* ¶ 28. "According to FE5, FE2 and FE5 were hired to

help clean up Schmitt's accounting practices." *Id.* "FE5 corroborated FE2's account regarding the proper procedure for the timing of recording an expense. FE5 explained, 'Nobody in [the Portland] office understood that – if somebody provided a service to us in January and billed us in March, they were reflecting that expense in March, but as a public company, it should have been reflected in January when the expense actually occurred.' According to FE5, the issues in Schmitt were so prevalent '[i]t was enough to make the auditors test everything.'" *Id.* ¶ 75. "FE5 also described Defendant Zapata as a disinterested CEO. FE5 explained that Zapata provided no leadership, describing a particular instance where FE5 was pitching a detailed package of new initiatives that the Company needed to do in order to make the Company more profitable and efficient. 'Five minutes into the meeting, which was about things that should be changed, and what management should have been vitally interested in, Zapata took a phone call and walked out of the room.'" *Id.* ¶ 76.

### B.    Analysis

Plaintiffs contend that defendants hid and then downplayed the company's internal control deficiencies. Opp. 10, ECF 35. Plaintiffs claim that, initially, defendants represented the company's "internal controls were effective." *Id.* "Yet, curiously," plaintiffs argue, "the 2020 10-K revealed that the company had deficient internal controls," *id.* at 3, but represented that the issues "were small and could be dealt with in a year's time." *Id.* at 10. Plaintiffs contend these representations were untrue, and the "pattern of repeated mistruths" continued in 2021 when defendants revealed "that the internal controls deficiencies were greater tha[n] originally disclosed." *Id.* For plaintiffs' claims to survive, they must allege facts showing that defendants engaged in "repeated mistruths," which plaintiffs have not done.

Plaintiffs assert that "[d]efendants do not explain how, after 12 months with no changes in the effectiveness of its internal controls, the Company suddenly faced deficient internal controls as of filing the 2020 10-K." *Id.* But the answer is contained in the 2020 Form 10-K, which states that, pursuant to 17 C.F.R. §§ 240.13a-15(f) and 240.15d-15(f), which require evaluations to be performed on a quarterly basis, the company "conducted an evaluation of the effectiveness of our internal controls over financial reporting" and based on that evaluation, "management concluded that our internal controls over financial reporting were not effective as of May 31, 2020." The form identified the deficiencies in the internal controls, including ones specifically relating to accounting. Plaintiffs find it suspicious that the company did not disclose any deficiencies in internal controls during the three prior quarters. But even plaintiffs allege that Schmidt, who lacked an accounting background, assumed the position of CFO in January 2020 and that he "was not familiar with running an accounting and finance department." *See* Am. Compl. ¶¶ 16, 69, ECF 28. Nothing about these circumstances shows that defendants knew about the problems with internal controls before they disclosed them.

In an attempt to establish falsity and scienter, plaintiffs rely on the statements of former employees who describe deficient accounting practices by "people who didn't know accounting," including improper coding of beverages sales, Am. Compl. ¶ 70, ECF 28, and failure to follow the proper procedures for processing bounced payments and recording invoices in the correct month. *Id.* ¶¶ 73, 74. But, again, "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM Global Value Fund,* 288 F.3d at 390 (citation omitted); *Alaska Elec. Pension Fund*, 434 F. Supp. 2d at 829 (holding "a failure to follow GAAP, without more, does not establish scienter"). "[T]o plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing . . . defendants

30 – FINDINGS AND RECOMMENDATIONS

knew specific facts at the time that rendered their accounting determinations fraudulent."

*Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005 WL 2347125, at \*14 (N.D. Cal. Sept. 23, 2005)

(citing *DSAM Global Value Fund,* 288 F.3d at 390–91).  The allegations by former employees

that invoices were incorrectly recorded appear consistent with the error disclosed in the Form 8-

K filed on September 20, 2022, where the company stated it had discovered "ineffective

application of cut-off procedures" that resulted in "the exclusion of certain general and

administrative expenses" from the quarterly forms.  Critically, though, none of the former

employees allege that any defendant had prior knowledge about these accounting errors and

delayed in disclosing them.  *See Alaska Elec. Pension Fund*, 434 F. Supp. 2d at 830 (finding the

allegations were "too vague and conclusory on which to impute scienter" where were no

allegations that the former employees "would know what [defendants] were aware of").

Plaintiffs contend that the restatement in the Form 8-K issued on September 20, 2022,

which disclosed that expenses were under-reported and over-reported in Q1, Q2, and Q3,

constitutes an admission that prior "financial results were materially false at the time they were

issued."  Opp. 10-11, ECF 35.  The "GAAP provides that a restatement should be issued only as

a result of errors caused by (i) a mathematical mistake; (ii) mistakes in the application of

accounting principles, or (iii) oversight or misuse of facts that existed at the time the financial

statement was prepared."  *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056,

1079 (W.D. Wash. 2003).  "In general, the mere publication of a restatement is not enough to

create a strong inference of scienter."  *Zucco*, 552 F.3d at 1000.  There are two exceptions that

apply under "certain narrow conditions."  *Id.*

> The first exception permits general allegations about "management's role in a
> corporate structure and the importance of the corporate information about which
> management made false or misleading statements" to create a strong inference of
> scienter when these allegations are buttressed with "detailed and specific

31 – FINDINGS AND RECOMMENDATIONS

allegations about management's exposure to factual information within the company."

*Id.* (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). "The second exception . . . permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management," i.e., "where the falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them." *Id.* at 1001 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)) (internal quotation marks omitted).

Here, the restatement was issued due to an accounting error, which is permitted by the GAAP and not a basis, in-and-of-itself, to establish scienter. *See Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 890 (N.D. Cal. 2008) (finding the restatements did not cogent and compelling requirement to establish scienter "because each could equally support the inference that stock options had been backdated through innocent bookkeeping error"). Moreover, there are no allegations to support either of the two "narrow" exceptions—plaintiffs have offered no "detailed and specific allegations" that management was previously exposed to this information, or that there was a falsity so patently obvious that it would be absurd to suggest top management was unaware of it. In fact, the Amended Complaint alleges that the people performing the accounting were making errors that they themselves were unaware of. FE4, who joined Schmitt in April 2021, stated that procedures were "established by people who didn't know accounting," and FE5, who began working for Ample Hills in October 2021, stated that "[n]obody . . . understood" that an expense "should be reflected [in the month] when the expense actually occurred." Am. Compl. ¶¶ 69, 74, 75, ECF 28.

Also, the restatement merely redistributed general and operating expenses among three quarters, disclosed that expenses in the second quarter had actually decreased rather than

32 – FINDINGS AND RECOMMENDATIONS

increased, and ultimately reported there had been under-recognition of general and operational expenses by \$330,203.  This amounts to only 2.1% of the company's general and operating expenses.  *See* 2022 Form 10-K (reflecting general and operating expenses of \$15,684,457).  Courts have held that restatements do not constitute sufficient evidence of scienter under such circumstances.  *See Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2016 WL 3971400, at *9 (S.D. Cal. July 25, 2016) (finding plaintiffs allegations did not satisfy the two narrow exceptions and observing the restated revenue differed by only 2.2%); *City of Royal Oak Ret. Sys. v. Itron, Inc.*, No. CV-11-77-RMP, 2012 WL 3966310, at *4 (E.D. Wash. Sept. 11, 2012) (finding restatement was not evidence of scienter where the "amount in question was just barely above the 5% rule of thumb for materiality" and the "competing, nonculpable explanation . . . is that [the defendant] made a mistake in their accounting procedures . . . and subsequently corrected that error by filing the restatement").

With respect to Ample Hills, plaintiffs allege that "[d]espite having access to Ample Hills' books and records per the asset purchase agreement, the Company recklessly failed to recognize that Ample Hills' books were not auditable."  Am. Compl. ¶ 69, ECF 28.  Plaintiffs point to the asset purchase agreement signed by Zapata, which states that Schmitt "acknowledges that it has conducted to its satisfaction, its own independent investigation and analysis of the Business."  Opp. 13, ECF 35; *see* July 15, 2020 Form 8K (Asset Purchase Agreement).  Plaintiffs argue:

> This suggests one of three things: (1) Defendants recklessly did not carry out a proper investigation into Ample Hills' books and records; (2) Defendants knew, but hid from shareholders, that Ample Hills' books and records were in shambles; or (3) Defendant Schmidt was so incapable of doing his job as CFO that he failed to recognize the state of Ample Hills' finances and allowed the acquisition to proceed. In any case, Schmitt falsely or recklessly misrepresented the state of Ample Hills' books and records for the purpose of acquiring the company.

33 – FINDINGS AND RECOMMENDATIONS

Opp. 13-14, ECF 35.  Plaintiffs also claim that the 2020 Form 10-K filed on August 31, 2020, which contained a section discussing risks related to Ample Hills, "should have included a statement concerning the risks of Ample Hills' finances potentially being not auditable."  *Id.* at 14.

Plaintiffs allege no facts showing that any of the defendants knew that Ample Hills' books were not auditable before the business was purchased.  The asset sales agreement states only that Schmitt had conducted an investigation and analysis of Ample Hills' business "to its satisfaction."  In fact, one of the witnesses states that "as Ample Hills was being audited, more and more discrepancies would be uncovered along the way."  Am. Compl. ¶ 70, ECF 28.  As defendants contend, "[t]his suggests that no defendant knew the state of Ample Hills' books until the attempted audit was underway."  Reply 15, ECF 38.

To the extent plaintiffs allege that defendants should have conducted a better investigation of Ample Hills' books before purchasing the business, that type of incompetence does not constitute scienter.  "Federal securities laws do not create a cause of action for corporate mismanagement that is not accompanied by deception."  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1094 (C.D. Cal. 2008) (recognizing that while the allegations showed defendants acted with "poor judgment, stubbornness, arrogance, and perhaps even incompetence," "because [they] do not show any deceit . . . , they cannot support a fraud claim").  *Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001), *abrogated on other grounds by Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023) ("[F]raud by hindsight is not actionable.") (quoting *Arazie v. Mullane,* 2 F.3d 1456, 1468 (7th Cir. 1993)).

Former employees also describe that Ample Hills "appeared to be headed for a downfall" and was "burning" $1 million to $2 million a month, but "management did not take steps, such

34 – FINDINGS AND RECOMMENDATIONS

as a hiring freeze or cap on spending, to address Ample Hills' financial issues." Am. Compl. ¶¶ 70, 74, ECF 28. Plaintiffs claim this ultimately led to the shuttering of all Ample Hills locations in December 2022 and the sale of Ample Hills in June 2023 for a fraction of what Schmitt paid for it. Opp. 4, ECF 35. Again, such facts "suggest poor decision-making, not fraud." *Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1206 (C.D. Cal. 2012), *aff'd sub nom. Buttonwood Tree Value Partners, L.P. v. Sweeney*, 667 F. App'x 238 (9th Cir. 2016); *see also In re REMEC*, 702 F. Supp. 2d at 1238 ("Plaintiffs produce evidence of corporate mismanagement.") (citing *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473–79 (1977) (holding that § 10(b) does not regulate internal corporate mismanagement, when not accomplished through deception)).

Additionally, Ample Hills was purchased in July 2020, but FE1 did not begin working for the company until September 2020 and FE4 did not begin working for the company until April 2021. The fact that former employees witnessed Ample Hills' decline after it was purchased does not show that any of the individual defendants were aware that Ample Hills' books were not auditable before it was purchased.

Plaintiffs assert that, under the core-operations doctrine, Ample Hills' status as one of Schmitt's core businesses supports an inference of scienter. Opp. 16-17, ECF 35. "This doctrine allows [the court] to infer 'that facts critical to a business's 'core operations' or an important transaction are known to a company's key officers.'" *S. Ferry LP, No. 2*, 542 F.3d at 783. But defendants did not work for Ample Hills before the business was purchased by Schmitt; therefore, the core operations doctrine does not help prove that defendants were aware the books were not auditable. And, as discussed above, defendants' alleged exercise of "poor judgment"

35 – FINDINGS AND RECOMMENDATIONS

and "even incompetence" in purchasing and managing Ample Hills does not establish fraud or deceit.  *Impac Mortg. Holdings*, 554 F. Supp. 2d at 1094.

Finally, plaintiffs contend that the departures of Case, Ferguson, and Schmidt support a strong inference of scienter.  Opp. 17, ECF 35.  An employee's resignation supports an inference of scienter only when "the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances."  *Zucco*, 552 F.3d at 1002.  Otherwise, "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons."  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017).

Case left the company in October 2018, Ferguson left in November 2019, and Schmidt left in December 2020.  Plaintiffs do not allege that the resignations were uncharacteristic of typical hiring and termination patterns or identify any "suspicious circumstances" related to the resignations.  Moreover, the restatement regarding under-recognized and over-recognized expenses was issued in September 2022, long after any of these three individuals had worked at the company.  And the weakness in internal controls was disclosed in the 2020 Form 10-K issued on August 31, 2020, well after Case and Ferguson left at the company.  Even after Case relinquished his title as CEO, he stayed on Special Adviser, and throughout the class period, other top executives remained at Schmitt.  *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1062–63 (9th Cir. 2014) ("Plaintiffs fail to provide any facts to connect these departures with the problems at issue in this lawsuit. More detrimental to their allegations, however, is that two of

the three individuals remained at NVIDIA in some type of advisory role.  Therefore, the most reasonable inference is that these departures were benign.").  "It is therefore quite plausible to infer that the resignations, . . . were the result of the company's poor performance and management" and "were not, in and of themselves, strongly indicative of scienter."  *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1050 (N.D. Cal. 2009).

## VI.    Holistic Examination

Upon concluding that "no individual allegations are sufficient," the court "conduct[s] a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *Zucco*, 552 F.3d at 992.  Here, when "*all* of the facts alleged" and the "plausible opposing inferences" are considered, and "the malicious and innocent inferences" are "compared," plaintiffs have failed to allege an inference of scienter that is as least as compelling as an alternative innocent explanation."  *Id.* at 991, 1006 (emphasis in original).

At the hearing on the motion, plaintiffs argued that the allegations "come together to paint this picture that the company's executives were not just mismanaging, but were acting in such a degree that it can be considered severely reckless."  *See also* Opp. 12-13, ECF 35.  The Ninth Circuit has held that a "Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008).  "This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).  Otherwise, "scienter would be established in every

case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *Glazer*, 549 F.3d at 747.

Although plaintiffs have alleged that proper accounting procedures were not followed, they have failed to allege the "presence of glaring accounting irregularities or other 'red flags.'" *See In re Acuity Brands, Inc. Sec. Litig.*, No. 1:18-CV-2140-MHC, 2019 WL 10246166, at *28 (N.D. Ga. Aug. 12, 2019) ("The Court finds that because Plaintiffs have made no factual allegations regarding glaring 'accounting irregularities' or 'red flags,' the Sarbanes-Oxley certifications signed by Nagel and Reece do not support an inference of scienter.").

Similar accounting errors were at issue in *Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440 MMM SHX, 2015 WL 1775221, at *24 (C.D. Cal. Apr. 14, 2015). There, the company issued restatements disclosing that it had incorrectly recognized revenue on the first day of the month following the effective date of the contract rather than on the effective date of the contract itself. *Id.* at *24. The company also disclosed that it had incorrectly classified certain revenue as deferred revenue. The plaintiffs claimed that the company had shifted revenue "from the present to the future" to "create the false impression that [it] had a significant future growth potential." *Id.* at *21. In granting the defendant's motion to dismiss, the court held that "[t]he mere fact that '[m]anagement' was responsible for assuring compliance with GAAP and adequate internal controls does not demonstrate that any individual defendant was involved in or aware of the particular accounting practices being challenged." *Id.* at *29. The court also found that the "[p]laintiffs have simply alleged insufficient facts to support a finding that the accounting errors in [the company's] financial statements were 'glaring' and that defendants who signed the Sarbanes–Oxley certifications knew or should have suspected from

38 – FINDINGS AND RECOMMENDATIONS

this or other 'red flags' that the financials contained material misstatements or omissions." *Id.* at *29 n.239.

For the same reason, the accounting errors in this case do not rise to the level of "glaring accounting irregularities or other 'red flags.'"  Moreover, by plaintiffs' own allegations, Schmitt's accounting procedures were developed by individuals who "didn't know accounting," and the company's CFO, who did not have an accounting background, "was not familiar with running an accounting and finance department.  Am. Compl. ¶¶ 69, 74, ECF 28.  Although this suggests incompetence, it does not show that any of the defendants, in certifying the financial statements, had reason to know or should have suspected that they contained material misstatements.

Again, even when viewed holistically, the allegations do not establish an inference of scienter that is "at least as compelling as an alternative innocent explanation." *Zucco*, 552 F.3d at 1006.[6]  Therefore, plaintiffs have failed to plead a claim under Section 10(b) or Rule 10b-5.

## VII.    Section 20(a) Claim

Under Section 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990 (quoting *America*

---

[6] Plaintiffs cite to a footnote in *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n. 8 (9th Cir. 2014), for the proposition that "a tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation."  Opp. 15, ECF 35.  That case in involved a RICO claim, not a question of scienter under the PSLRA.  Moreover, as the Ninth Circuit stated in the rest of the footnote, "the problem here is that in the context of Defendants' specific intent to defraud, Plaintiffs' complaint alleges facts that support—at best—a 'possible' basis to believe that Defendants specifically intended to defraud, not a 'plausible' one."  751 F. 3d at 999 n. 8.

*West*, 320 F.3d at 945). Plaintiffs have not sufficiently alleged Section 10(b) and Rule 10b-5 violations. In the absence of a primary violation, plaintiffs' 20(a) claims cannot stand. *See id.* (holding that "Section 20(a) claims may be dismissed summarily if a plaintiff fails to adequately plead a primary violation of section 10(b)").

## VIII.   Dismissal With Prejudice

Plaintiffs have not requested leave to amend or explained how they could amend the complaint to cure the deficiencies identified in the motion to dismiss. While Rule 15 states that "[t]he court should freely give leave when justice so requires," the decision to grant or deny leave to amend lies within the sound discretion of the court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "A district court does not err in denying leave to amend where the amendment would be futile[.]." *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) (internal citations omitted); *see also Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) ("Futility of amendment can, by itself, justify the denial of a motion for leave to amend."). Leave to amend is properly denied based on futility where the movant has not presented facts that would cure the deficiency in the pleading. *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011).

Plaintiffs have already amended the complaint once. Moreover, any additional theories and facts that plaintiffs included in their opposition to the motion to dismiss have been considered. Yet plaintiffs fail to meet the heightened standard required to plead a securities fraud claim. At this stage, and under these circumstances, dismissal with prejudice is the just result.

## RECOMMENDATIONS

Defendants' Motion to Dismiss (ECF 30) should be granted and this case should be dismissed with prejudice.

40 – FINDINGS AND RECOMMENDATIONS

**SCHEDULING ORDER**

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Friday, February 16, 2024.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED February 2, 2024.

/s/ Youlee Yim You

Youlee Yim You
United States Magistrate Judge

41 – FINDINGS AND RECOMMENDATIONS